## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| YOLANDA WRIGHT, Individually and on behalf of her minor son, MEKHI BURKETT, and ROSE RITA BAILEY, Individually and on behalf of her minor son, JAWUANE JOHNSON, Plaintiffs, | : : : : : : | |
| v. | : : | No. 5:20-cv-02664 |
| WHITEHALL TOWNSHIP, MICHAEL MARKS, AARON REED, MICHAEL SLIVKA, KENNETH STEPHENS, TIMOTHY DUGAN, BRIAN CUTH, JEFFREY APGAR, MATTHEW RESZEK, MICHAEL P. HARAKAL, JR., WHITEHALL-COPLAY SCHOOL DISTRICT, LORIE D. HACKETT, and ROBERT HARTMAN, Defendants. | : : : : : : : : | |

_____

# **O P I N I O N**

**Motion to Dismiss the Amended Complaint, filed by Whitehall Township, Michael Marks, Aaron Reed, Michael Slivka, Kenneth Stephens, Timothy Dugan, Brian Cuth, Jeffrey Apgar, and Matthew Reszek, ECF No. 10—GRANTED.**

**Motion to Dismiss the Amended Complaint, filed by Whitehall-Coplay School District, Lorie D. Hackett, and Robert Harman, ECF No. 18—GRANTED.**

**Motion to Dismiss the Amended Complaint, filed by Michael Harakal, Jr., ECF No. 19—GRANTED.**

**Joseph F. Leeson, Jr.**                                                                     **January 12, 2021**
**United States District Judge**

## I.      INTRODUCTION

This is a civil rights action stemming from an altercation between police officers and a

group of African American teenagers attending a high school basketball game in Whitehall,

Pennsylvania.  Plaintiffs' 93-page Amended Complaint asserts myriad federal and state law

claims against individual Whitehall Township police officers, as well as the Whitehall-Coplay

School District and Whitehall Township.  Presently before the Court are three motions in which Defendants seek dismissal of the majority of Plaintiffs' claims.  Upon consideration of the allegations in the Amended Complaint, as well as the arguments put forward in Defendants' motions and by Plaintiffs in opposition thereto, for the reasons set forth below the three motions to dismiss are granted with leave to amend, subject to the provisions set forth hereinafter.

## II.    BACKGROUND

### A.    Facts Alleged in Plaintiffs' Amended Complaint[1]

The incident at the heart of this lawsuit occurred on January 28, 2020.  On that date, African American teenagers Mekhi Burkett, then 16 years old, and Jawuane Johnson, then 17 years old, attended a basketball game at Whitehall High School, where they were both students.[2] Plaintiffs' Amended Complaint ("Am. Compl."), ECF No. 6, ¶¶ 26-27.  The two boys were seated in the top row of the bleachers surrounding the basketball court along with several other African American teenagers.  *Id.* ¶ 28.

According to the Amended Complaint, the group of teens was preparing to enjoy the basketball game when they were approached by Whitehall Township Police Officer Kenneth Stephens, who was in attendance as part of his normal duties.[3]  Am. Compl. ¶ 29.  Officer

---

[1]    These allegations are accepted as true, with all reasonable inferences drawn in Plaintiffs' favor.  *See Lundy v. Monroe Cty. Dist. Attorney's Office*, No. 3:17-CV-2255, 2017 WL 9362911, at *1 (M.D. Pa. Dec. 11, 2017), *report and recommendation adopted*, 2018 WL 2219033 (M.D. Pa. May 15, 2018).  Neither conclusory assertions nor legal contentions need be considered by the Court in determining the viability of Plaintiffs' claims.  *See Brown v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, No. 1:19-CV-1190, 2019 WL 7281928, at *2 (M.D. Pa. Dec. 27, 2019).  Portions of the Amended Complaint constitute legal argument or facts pleaded upon information and belief.  The Court refrains from reciting the majority of those assertions here.
[2]    Whitehall High School is part of the Whitehall-Coplay School District.  Am. Compl. ¶ 27.
[3]    Plaintiffs aver that "[u]pon information and belief, it was the policy" of the school district "to demand armed law enforcement presence at school functions, including sporting events such as junior varsity basketball games."  Am. Compl. ¶ 33.

Stephens, who is white, began questioning the group about Nyceire Allen, another African American teen who had joined the group in the bleachers. *Id.* ¶ 30. What exactly transpired next is less than clear. The Amended Complaint avers in somewhat opaque terms that "[a]ccording to the affidavit of probable cause,[4] Mr. Allen 'reportedly gave [Robert Hartman, the Whitehall High School Athletic Director] attitude'" before joining the group in the bleachers, which caused Hartman, "a Caucasian male, [to] somehow determine that Mr. Allen's 'attitude' necessitated the intervention of law enforcement to remove him from the premises." *Id.* ¶¶ 31-32. Plaintiffs allege that Officer Stephens, at the command of Hartman, demanded that Allen "come with him."[5] *Id.* ¶ 36.

Whitehall Police Officers Brian Cuth, Aaron Reed, and Timothy Dugan, each of whom is white, then joined Officer Stephens in the bleachers. Am. Compl. ¶ 39. According to the Amended Complaint, Burkett and Johnson asked Officers Stephens, Cuth, Reed, and Dugan the reason for Allen's removal. *Id.* ¶ 40. Simultaneously, Athletic Director Hartman, who was standing at the base of the bleachers, again insisted that Officer Stephens remove Allen. *Id.* ¶ 43. Plaintiffs aver that this "necessitated [Officer] Stephens to use physical force toward Mr. Allen and the group, including [ ] Burkett and Johnson." *Id.* ¶ 44. In particular, Officer "Stephens and/or Cuth and/or Reed and/or Dugan, becoming visibly frustrated [and] . . . grabbed one of the

---

[4]     The Amended Complaint refers to "the affidavit of probable cause" without explaining what this document relates to or concerns. Reading the Amended Complaint further makes clear that this is an affidavit of probable cause prepared in connection with charges filed against Burkett and Johnson.

[5]     The Amended Complaint states that Officer Stephens "express[ed] his intent to execute a Fourth Amendment seizure of Mr. Allen," that "Burkett and Johnson repeatedly asked [Officer] Stephens why he was attempting to execute a seizure of Mr. Allen," and that "[Officer] Stephens refused to provide a reason for the request other than to state Defendant Hartman wanted Mr. Allen to leave." Am. Compl. ¶¶ 36-38. It is unclear how, if at all, beyond stating "come with me" Officer Stephens expressed "his intent to execute a Fourth Amendment seizure of Allen."

black teens by the shirt and attempted to drag him out of the crowd." *Id.* ¶ 45.  During this process, Officer "Stephens and/or Cuth and/or Reed and/or Dugan violently came into contact with several other teens, including [ ] Burkett and Johnson, causing [ ] Stephens and/or Cuth and/or Reed and/or Dugan to fall into the crowd." *Id.* ¶ 46.  Around this time, Officer Jeffrey Apgar, who is also white, led a German Shepherd K-9 officer named "Mex" into the group.[6] *Id.* ¶¶ 47-48.  Plaintiffs state that additionally, "either [Officer] Cuth, Reed, Dugan or Stephens" reached out and shoved Burkett, causing him to fall down several rows of bleachers.  *Id.* ¶ 50. Burkett and Johnson then made their way to the floor of the gym.  *Id.* ¶ 51.  During the encounter and following when Burkett and Johnson were on the floor of the gym, no one advised the teens they were under arrest, nor did any officer attempt to restrain them or take them into custody. *See id.* ¶¶ 52-53.

The Amended Complaint alleges that at some point when Burkett and Johnson were on the gym floor, Officer Apgar lifted "Mex" up off the ground by his harness and began swinging the barking dog around at the teens.[7]  Am. Compl. ¶ 55.  Around this time, the police officers began directing adults and children from the gym floor into the hallway.[8]  *Id.* ¶ 56.  However, shortly after the hallways were full of people, the officers attempted to move everyone back into the gym, yelling for people to "clear the hallway" and "get in the gym."  *Id.* ¶ 58.

The Amended Complaint next avers that while all of this was happening, Johnson was caught in a doorway between the gym and hallway, and between officers' conflicting directives

---

[6]     Plaintiffs aver that "Mex" was "wildly attacking" the group of teens.  Am. Compl. ¶ 48. They further state that "'Mex' was so out of control and not properly restrained that, upon information and belief, at or about this time he bit one of the officers in the head."  *Id.* ¶ 49.
[7]     The Amended Complaint contains pictures purportedly depicting this alleged sequence of events.  *See* Am. Compl. ¶ 55.
[8]     Plaintiffs insinuate that the reason for moving people into the hallway was the fact that the officers' "reckless" conduct had "caused a generalized panic."  Am. Compl. ¶ 56.

to exit the gym and to return to the gym from the hallway.  Am. Compl. ¶ 61.  Burkett was holding on to Johnson's backpack and attempting to pull Johnson back into the gym, at which point Officer "Reed and/or [Michael] Slivka and/or Stephens and/or Dugan and/or Cuth and/or Apgar and/or [Matthew] Reszek . . . grabbed [ ] Johnson and drug him several feet out into the hallway."  *Id*. ¶¶ 62-63, 65.  According to the Amended Complaint, despite never resisting, Officer "Reed and/or Slivka and/or Stephens and/or Dugan and/or Cuth and/or Apgar and/or Reszek . . . slam[ed] [ ] Johnson's head into a wall with such force that he suffered a concussion," and then "tackled him to the ground where he again hit his head."[9]  *Id*. ¶ 67.

During the melee, Burkett, who was still holding on to Johnson's backpack, was dragged into the hallway.  Am. Compl. ¶ 68.  Burkett was then "put in a chokehold by Reed and/or Slivka and/or Stephens and/or Dugan and/or Cuth and/or Apgar and/or Reszek, who also pinned his arm behind his back," causing him to fall to the ground and strike his head.  *Id*. ¶ 69.  According to the Amended Complaint, the officers continued to hold Burkett in a "chokehold" despite his stating that he "couldn't breathe" and that the officer was going to "break [his] arm."  *Id*. ¶ 70.  The officers then lifted Burkett off of the ground, while one of them continued to hold him in a chokehold, and "slammed" his head into the floor causing him to sustain a concussion.[10]  *Id*. ¶ 73.  As a consequence of his restrained posture, Burkett was not, nor was he capable, of resisting arrest.  *Id*. ¶ 71.

---

[9]     The Amended Complaint states that in acting in this way, the officers "executed an unreasonable use of force."  Am. Compl. ¶ 67.  This is an example of a legal conclusion that the Court need not consider in evaluating the sufficiency of Plaintiffs' allegations.

[10]     The officers' interactions with Burkett were allegedly captured on video, which Plaintiffs claim depicts that the interaction occurred as alleged.  *See* Am. Compl. ¶¶ 72-73.  The Amended Complaint also alleges that Burkett and Johnson suffered myriad and ongoing injuries generally as a result of the Defendants' conduct.  *See id*. ¶¶ 92-94.

Burkett and Johnson were then taken into custody and brought to the Whitehall Township Police Department, along with two other African American students.  Am. Compl. ¶ 75.  The Amended Complaint avers that "despite there being several non-African Americans" among the group of teens "that the officers referred to as an 'angry mob', only the black teens were arrested and charged with crimes."[11]  *Id.* ¶ 76.  Burkett and Johnson were held in custody for over an hour before being permitted to speak with their parents, during which time they did not receive any medical care.  *Id.* ¶¶ 77-78.  When Burkett's mother, Yolanda Wright, saw her son for the first time, she observed bruises on him, and inquired as to whether he had received any medical treatment.  *Id.* ¶¶ 79-80.  The responding police officer stated that Burkett was not injured.  *Id.* ¶ 81.

According to the Amended Complaint, the following day, "Defendant Officers engaged in a scheme, plan and design to assist in covering up their and their fellow Defendant Officers [sic] outrageous conduct by, inter alia, filing false police reports, lying about the incident, and maliciously prosecuting Plaintiffs on false and fabricated charges."  Am. Compl. ¶ 82.  Plaintiffs claim this is evidenced by the fact that the affidavit of probable cause "fails to mention [ ] Johnson's head being slammed into the wall/locker, [ ] Burkett being suplexed, head first, into the ground by Defendant Officers, or the K-9 being lifted from the ground and swung around."[12]  *Id.* ¶¶ 82-83.[13]

---

[11]    It is not clear from the pleadings where or when the officers referred to the group of teens as an "angry mob."

[12]    Plaintiffs further state that "[s]ince it is the policy, decision, custom, usage and/or practice of the Whitehall Township Police Department, under the direction, supervision and order of Defendant Marks and Harakal for its officers to not utilize body cameras, the veracity of the entire Affidavit is in question."  Am. Compl. ¶ 84.

[13]    Paragraphs 86-91 of the Amended Complaint contain purely legal argument which the Court does not recite here.

Based upon the above averments, the Amended Complaint purports to assert the following twenty-two causes of action:[14]

- Claims One and Ten:[15]  Excessive force in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution (Burkett/Johnson v. Reed, Slivka, Stephens, Dugan, Cuth, Apgar, and Reszek)

- Claims Two and Eleven:  Retaliation in violation of the First Amendment (Burkett/Johnson v. Reed, Slivka, Stephens, Dugan, Cuth, Apgar, and Reszek)

- Claims Three and Twelve:  Deliberately indifferent policies, practices, customs, training, and supervision in violation of the First, Fourth, and Fourteenth Amendments (Burkett/Johnson v. Michael Marks, Michael Harakal, and Whitehall Township)

- Claims Four and Thirteen:  State-created danger–substantive due process violation of the Fourteenth Amendment (Burkett/Johnson v. Whitehall-Coplay School District, Hackett, and Hartman)

- Claims Five and Fourteen:  Conspiracy to violate civil rights under 42 U.S.C. § 1983 (Burkett/Johnson v. Reed, Slivka, Stephens, Dugan, Cuth, Apgar, and Reszek)

- Claims Six and Fifteen:  Violation of equal rights under 42 U.S.C. § 1981 (Burkett/Johnson v. All Defendants)

---

[14]    The Court here recites Plaintiffs' claims as phrased in the Amended Complaint.  In doing so, the Court does not accept that the claims are viable or properly pleaded.

[15]    Claims one through nine and ten through eighteen are identical claims, with the first set of claims brought on behalf of Burkett and the second set brought on behalf of Johnson.

- Claims Seven and Sixteen:  Conspiracy to interfere with civil rights under 42 U.S.C. § 1985 (Burkett/Johnson v. Whitehall Township, Marks, Harakal, Reed, Slivka, Stephens, Dugan, Cuth, Apgar, and Reszek)

- Claims Eight and Seventeen:  Violation of Article I, Section 8 of the Pennsylvania Constitution (Burkett/Johnson v. Whitehall Township, Marks, Harakal, Reed, Slivka, Stephens, Dugan, Cuth, Apgar, and Reszek)

- Claims Nine and Eighteen:  Assault and battery (Burkett/Johnson v. Whitehall Township, Marks, Harakal, Reed, Slivka, Stephens, Dugan, Cuth, Apgar, and Reszek)

- Claim Nineteen:  Interference with intimate association (Wright v. Reed, Slivka, Stephens, Dugan, Cuth, Apgar, and Reszek)

- Claim Twenty:  Interference with intimate association (Wright v. Marks and Whitehall Township)

- Claim Twenty-One:  Interference with intimate association (Bailey v. Reed, Slivka, Stephens, Dugan, Cuth, Apgar, and Reszek)

- Claim Twenty-Two:  Interference with intimate association (Bailey v. Marks and Whitehall Township)

**B.    Procedural Background**

Plaintiffs commenced this lawsuit by filing the initial Complaint on June 8, 2020.[16]  *See* ECF No. 1.  On August 10, 2020, several Defendants moved to dismiss the initial Complaint in part, *see* ECF No. 5, in response to which Plaintiffs filed their Amended Complaint on August

---

[16]    The initial Complaint asserted the following claims:  Fourth Amendment excessive force, First Amendment retaliation, municipal liability, assault and battery, and interference with intimate association.

31, 2020, *see* ECF No. 6.  On September 14, 2020, Whitehall Township and the police officer

Defendants filed their motion to dismiss the Amended Complaint.  *See* ECF No. 10.  On October

30, 2020, Whitehall-Coplay School District, Lorie Hackett, and Robert Hartman filed their

motion to dismiss the Amended Complaint.  *See* ECF No. 18.  On November 5, 2020, the

remaining Defendant, Michael Harakal, moved to dismiss the Amended Complaint.  *See* ECF

No. 19.

## III.    LEGAL STANDARD:  FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court clarified the appropriate

pleading standard in civil cases and set forth the approach to be used when deciding motions to

dismiss brought under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

After identifying a pleaded claim's necessary elements,[17] district courts are to "identify [

] pleadings that, because they are no more than conclusions, are not entitled to the assumption of

truth."  *Id*. at 679; *see id*. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'" (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007))); *Thourot v. Monroe Career & Tech. Inst*., No. CV 3:14-1779, 2016

WL 6082238, at *2 (M.D. Pa. Oct. 17, 2016) (explaining that "[a] formulaic recitation of the

elements of a cause of action" alone will not survive a motion to dismiss).  Although "legal

conclusions can provide the framework of a complaint, they must be supported by factual

allegations."  *Iqbal*, 556 U.S. at 679.

---

[17]    The Third Circuit has identified this approach as a three-step process, with identification
of a claim's necessary elements as the first step.  *See Connelly v. Lane Const. Corp.*, 809 F.3d
780, 787 n.4 (3d Cir. 2016) ("Although *Ashcroft v. Iqbal* described the process as a 'two-pronged
approach,' 556 U.S. 662, 679 (2009), the Supreme Court noted the elements of the pertinent
claim before proceeding with that approach, *id.* at 675-79.  Thus, we have described the process
as a three-step approach.") (citation omitted).

Next, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678.  This standard, commonly referred to as the "plausibility standard," "is not comparable to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*. (citing *Twombly*, 550 U.S. at 556-57).  It is only where the "[f]actual allegations . . . raise a right to relief above the speculative level" that the plaintiff has stated a plausible claim.[18]  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

Putting these steps together, the Court's task in deciding a motion to dismiss for failure to state a claim is to determine the following:  whether, based upon the facts as alleged, which are taken as true, and disregarding legal contentions and conclusory assertions, the complaint states a claim for relief that is plausible on its face in light of the claim's necessary elements.  *Iqbal*, 556 U.S. at 679; *Ashford v. Francisco*, No. 1:19-CV-1365, 2019 WL 4318818, at *2 (M.D. Pa. Sept. 12, 2019) ("To avoid dismissal under Rule 12(b)(6), a civil complaint must set out sufficient factual matter to show that its claims are facially plausible."); *see Connelly*, 809 F.3d at 787.

In adjudicating a Rule 12(b)(6) motion, the scope of what a court may consider is necessarily constrained:  a court may "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the

---

[18]    As the Supreme Court has observed, "[d]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679

complainant's claims are based upon these documents."  *United States v. Gertsman*, No. 15

8215, 2016 WL 4154916, at *3 (D.N.J. Aug. 4, 2016) (quoting *Guidotti v. Legal Helpers Debt*

*Resolution*, L.L.C., 716 F.3d 764, 772 (3d Cir. 2013)).  A court adjudicating a Rule 12(b)(6)

motion may also take judicial notice of certain undisputed facts.  *See Devon Drive Lionville, LP*

*v. Parke Bancorp, Inc.*, No. CV 15-3435, 2017 WL 5668053, at *9 (E.D. Pa. Nov. 27, 2017).

## IV.    DISCUSSION

### A.    The Contentions of the Parties

#### 1.    *The Township Defendants' Motion to Dismiss*

Whitehall Township moves to dismiss the Amended Complaint with individual

Defendants Apgar, Cuth, Dugan, Marks, Reed, Reszek, Slivka, and Stephens ("Township

Defendants").  *See* Township Defendants' Memorandum in Support of Their Motion to Dismiss

("Township Mem."), ECF No. 10-2.  The Township Defendants first argue that there are

insufficient factual allegations to support any claim for municipal liability under 42 U.S.C. §

1983, whether brought on behalf of the Burkett or Johnson, or their mothers.  In particular, they

claim Plaintiffs have not identified any municipal custom, policy, or practice to support

municipal liability, or any pattern of conduct capable of supporting liability under a failure to

train theory.  *See id.* at 8-9.  The Township Defendants also contend that any official capacity

claims against Michael Marks, who is the Whitehall Township Police Chief, should be dismissed

as duplicative of claims against the Township.   *See id.* at 10.

The Township Defendants next argue that the Amended Complaint fails to state claims

for violation of 42 U.S.C. § 1981.  In particular, they argue that the Amended Complaint fails to

allege facts "to support a plausible claim of racial discrimination in connection with plaintiffs'

arrest, including facts to make out . . . discriminatory effect—that plaintiffs were treated

differently from similarly situated individuals in an unprotected class." Township Mem. at 12. "That plaintiffs are African American and being arrested is insufficient, standing alone, to show discriminatory effect." *Id.* "Moreover," the Township Defendants state that "citing that other white students were present in the crowd of spectators at the basketball game and not arrested is wholly insufficient as such other students were not similarly situated nor were they alleged to have engaged in any behavior similar to the plaintiffs – i.e. disorderly conduct, resisting arrest, physically obstructing the officers' lawful actions." *Id.*

The Township Defendants also argue that the Amended Complaint fails to state a claim for conspiracy under either 42 U.S.C. § 1983 or § 1985. In particular, Defendants contend that there are no allegations capable of supporting the existence of an agreement to violate civil rights, and any such purported allegations are boilerplate and conclusory. *See* Township Mem. at 13-14.

Finally, the Township Defendants contend that Plaintiffs are unable to state a claim directly under the Pennsylvania Constitution, as no such right of action exists, *see* Township Mem. at 14-15, and further, Plaintiff-Mothers are unable to assert a claim for interference with intimate association because no conduct of Defendants was directed at the familial relationship between Burkett and Johnson and their mothers, *see id.* at 15-17.

### 2. *The School District Defendants' Motion to Dismiss*

Whitehall-Coplay School District moves to dismiss the Amended Complaint with Lorie Hackett, the Superintendent, and Whitehall High School Athletic Director Robert Hartman ("School District Defendants"). *See* School District Defendants' Memorandum in Support of Their Motion to Dismiss ("District Mem."), ECF No. 18. These Defendants make two primary arguments. They first argue that Plaintiffs fail to plead claims under the state-created danger

doctrine.  Specifically, they state that with respect to the School District Defendants, Plaintiffs

fail to plead facts to support that (1) Plaintiffs' harm was direct and foreseeable, (2) Defendants'

conduct was of a level of culpability that "shocks the conscience," and (3) any direct causal

relationship existed between Defendants' conduct and the harm suffered by Plaintiffs.  *See id*. at

13-26.

Secondly, the School District Defendants argue that the Amended Complaint fails to state

a claim for liability under 42 U.S.C. § 1981.  They contend that a § 1981 claim fails because

there are no facts to support that (1) the School District Defendants intended to discriminate on

the basis of race, or (2) Plaintiffs' rights to be free from discrimination in the making or

enforcement of contracts and/or property rights were infringed.  *See* District Mem. at 26-32.

### 3.     *Mayor Michael Harakal's Motion to Dismiss*

Michael Harakal, the Mayor of Whitehall Township, has also moved to dismiss the

Amended Complaint.  *See* Michael Harakal's Memorandum in Support of His Motion to Dismiss

("Harakal Mem."), ECF No. 19-2.  Harakal's arguments generally track the Township

Defendants' arguments—*i.e.*, Plaintiffs fail to allege municipal liability, Plaintiffs fail to allege

liability under 42 U.S.C. § 1981, § 1983, or § 1985, and Plaintiffs fail to state a claim directly

under the Pennsylvania Constitution, as no such right of action exists.  *See generally id.*

### B     The Viability of Plaintiffs' Claims

### 1.     *Plaintiffs' claims against Marks, Harakal, and Hackett are dismissed*

Plaintiffs appear to sue Chief of Police of Whitehall Township Michael Marks, Mayor of

Whitehall Township Michael Harakal, and Superintendent of Whitehall-Coplay School District

Lorie Hackett each in their official capacities.  *See* Am. Compl. ¶¶ 15-21.  Claims against these

parties in their official capacities are duplicative of claims against the entities of which they are

officers:  Whitehall Township (in the case of Marks and Harakal) and the Whitehall-Coplay

School District (in the case of Hackett).  *See Acosta v. Democratic City Comm.*, 288 F. Supp. 3d

597, 639 n.27 (E.D. Pa. 2018) ("Suits against state actors in their official capacity, in contrast to

personal capacity suits, 'generally represent only another way of pleading an action against an

entity of which an officer is an agent.' Provided that 'the government entity receives notice and

an opportunity to respond, an official-capacity suit is, in all respects other than name, to be

treated as a suit against the entity.'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 165-66

(1985))); *Myers v. City of Wilkes-Barre*, No. 3:18-CV-42, 2019 WL 210938, at *6 (M.D. Pa. Jan.

15, 2019) ("Where both the City of Wilkes-Barre and Defendants George and Lendacky have

been sued for the violations of Plaintiff's First Amendment rights, the claims against Defendants

George and Lendacky in their official capacities are duplicative of the claims against the City of

Wilkes-Barre and those individual defendants will thus be dismissed in their official capacities . .

. .").

Therefore, any and all claims against Marks, Harakal, and Hackett, are dismissed.[19]

### 2.    *Plaintiffs' claims under the Pennsylvania Constitution fail*

Counts eight and seventeen of the Amended Complaint assert claims under Article I,

Section 8 of the Pennsylvania Constitution.  This provision of Pennsylvania's Constitution,

similar to the Fourth Amendment to the United States Constitution, provides that "[t]he people

shall be secure in their persons, houses, papers and possessions from unreasonable searches and

---

[19]      Nor are there any factual allegations that could support claims against these individuals in their personal capacities.  *See Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988) ("It is well-established that an individual defendant can be liable in his or her individual capacity under section 1983 if the individual is personally involved in the alleged wrongs. 'Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988))).

seizures."  PA. CONST. art. I, § 8.  However, Plaintiffs do not offer any argument in support of

these claims, nor could they.  "The prevailing view is that Pennsylvania does not recognize a

private right of action for damages in a suit alleging violation of the Pennsylvania Constitution."

*Ekwunife v. City of Philadelphia*, 245 F. Supp. 3d 660, 678 (E.D. Pa. 2017) (quoting *Gary v.*

*Braddock Cemetery*, 517 F.3d 195, 207 (3d Cir. 2008)), *aff'd*, 756 F. App'x 165 (3d Cir. 2018).

In the absence of a private right of action, these claims are not viable and are dismissed.

### 3.     *Plaintiffs' claims under 42 U.S.C. § 1981 fail*

Counts six and fifteen of the Amended Complaint assert claims for violation of 42 U.S.C.

§ 1981.  Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States

shall have the same right in every State and Territory to make and enforce contracts, to sue, be

parties, give evidence, and to the full and equal benefit of all laws and proceedings for the

security of persons and property as is enjoyed by white citizens."  The Third Circuit has

observed that "to state a claim under § 1981, a plaintiff must allege facts in support of the

following elements: (1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate

on the basis of race by the defendant; and (3) discrimination concerning one or more of the

activities enumerated in the statute."[20]  *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir.

2001) (internal quotation marks omitted).

---

[20]     Plaintiffs' claims asserting a violation of § 1981, as well as their claims asserting
constitutional torts, are properly brought pursuant to 42 U.S.C. § 1983.  Section 1983 provides in
pertinent part that "[e]very person who, under color of any [state law] . . . subjects, or causes to
be subjected, any citizen of the United States or other person within the jurisdiction thereof to the
deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be
liable to the party injured in an action at law."  Section 1983 "is not itself a source of substantive
rights;" rather, the statute is a "method for vindicating federal rights elsewhere conferred by
those parts of the United States Constitution and federal statutes that it describes."  *Baker v.*
*McCollan*, 443 U.S. 137, 145 n.3 (1979); *Grammer v. John J. Kane Reg'l Centers-Glen Hazel*,
570 F.3d 520, 525 (3d Cir. 2009) (explaining that § 1983 "is a vehicle for imposing liability
against anyone who, under color of state law, deprives a person of 'rights, privileges, or

Any claim for relief under § 1981 that Plaintiffs attempt to raise must necessarily fail, as the Amended Complaint is devoid of any allegations that can plausibly support that Plaintiffs suffered discrimination "concerning one or more of the activities enumerated in the statute." *Brown*, 250 F.3d at 797. These activities include the making and enforcing of contracts, suing, being a party to a lawsuit, and giving evidence. *See* 42 U.S.C. § 1981(a). Plaintiffs' allegations concern an unlawful confrontation between students and police officers at a high school basketball game. Plaintiffs do not attempt to articulate which activity enumerated in the statute this confrontation implicates. The alleged unlawful conduct is completely disconnected from any of these activities. General claims of excessive force or police misconduct—even when racially motivated—are not properly cognizable under § 1981 in the absence of a connection to one of § 1981(a)'s enumerated activities. *See Tucker v. City of Philadelphia*, No. CV 16-3104, 2017 WL 5010032, at *3 (E.D. Pa. Nov. 2, 2017) (finding a plaintiff who alleged police misconduct where plaintiff "was innocently riding his bicycle when he was brutally attacked by the police without warning," did "not attempt to establish the third prong of a Section 1981 claim, i.e., discrimination concerning one or more of the activities enumerated in the statute"); *Herring v. Gorbey*, No. CV 17-278, 2017 WL 5885668, at *5 (E.D. Pa. Nov. 27, 2017) (finding a plaintiff alleging mistreatment at the hands of a judicial officer "fail[ed] to state a claim alleging racial discrimination in the 'making and enforcement of contracts and property transactions'"); *Blake v. Minner*, No. CIV A 07-125, 2007 WL 1307564, at *4 (D. Del. May 1, 2007) (finding a prisoner who brought suit for prison raid that allegedly targeted African

---

immunities secured by the Constitution and laws'"); *see Three Rivers Ctr. for Indep. Living v. Hous. Auth. of City of Pittsburgh*, 382 F.3d 412, 422 (3d Cir. 2004) ("Once the plaintiff establishes the existence of a federal right, there arises a rebuttable presumption that the right is enforceable through the remedy of § 1983.").

American inmates failed to state a § 1981 claim, because "[a]bsent from the Complaint were any allegations regarding the one or more activities enumerated in the statute").

As a consequence, Plaintiffs' § 1981 claims necessarily fail and are dismissed.[21]

### 4.    *Plaintiff-Mothers' interference with intimate association claims fail*

Counts nineteen through twenty-two of the Amended Complaint assert claims for interference with intimate association brought by Yolanda Wright and Rose Rita Bailey, the mothers of Burkett and Johnson.  The constitutional right to freedom of intimate association "protects an individual's right 'to enter into and maintain certain intimate human relationships.'"[22]  *Starnes v. Butler Cty. Court of Common Pleas, 50th Judicial Dist.*, 971 F.3d 416, 431 (3d Cir. 2020) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617 (1984)).  Relevant to Plaintiffs' claims here, "[f]amily relationships are the paradigmatic form of protected intimate associations."  *Pi Lambda Phi Fraternity, Inc*, 229 F.3d at 441.  However, "[t]o make out such a claim, a plaintiff must allege 'that the challenged action directly and substantially interfered with

---

[21]    Even if the Amended Complaint stated a plausible § 1981 claim, such a claim would not be cognizable against Whitehall Township or Whitehall-Coplay School District, "because a private cause of action cannot be asserted against a municipal [actor] for a violation of § 1981." *Gelpi v. City of Philadelphia*, 183 F. Supp. 3d 684, 690 (E.D. Pa. 2016) (quoting *Lande v. City of Bethlehem*, 457 Fed. Appx. 188, 193 (3d Cir. 2012)).

[22]    "Two types of association are protected by the federal Constitution: intimate association (i.e., certain close and intimate human relationships like family relationships) and expressive association (i.e., association for the purpose of engaging in activities protected by the First Amendment)."  *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 438 (3d Cir. 2000), *as amended* (Nov. 29, 2000).  "[T]he description of the right to intimate association as a 'fundamental element of personal liberty' sounds in Fourteenth Amendment substantive due process terms. Nonetheless, Supreme Court cases following [*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)] suggest that the right to intimate association has roots in the First Amendment as well."  *Gardner v. Barry*, No. 1:10-CV-0527, 2010 WL 4853885, at *5 (M.D. Pa. Nov. 23, 2010) (collecting cases); *see, e.g.*, *Derr v. Northumberland Cty. CYS*, No. 4:19-CV-00215, 2019 WL 6210899, at *5 (M.D. Pa. Oct. 23, 2019) ("There are two types of association protected by the First Amendment: expressive and intimate."), *report and recommendation adopted sub nom. Derr v. Northumberland Cty. Children & Youth Servs.*, No. 4:19-CV-00215, 2019 WL 6173975 (M.D. Pa. Nov. 20, 2019).

the intimate relationship.'" *Vanderhoff v. City of Nanticoke*, No. 3:18-CV-01071, 2018 WL 4565673, at *5 (M.D. Pa. Sept. 24, 2018) (quoting *Kost v. Baldwin*, No. CV 3:16-2008, 2017 WL 4362720, at *5 (M.D. Pa. Sept. 29, 2017)); *Myers v. Fayette Cty.*, No. CV 20-900, 2020 WL 6047566, at *3 (W.D. Pa. Oct. 13, 2020) (same); *see Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW*, 485 U.S. 360, 366 (1988) (finding a statute that made households whose members were participating in a labor strike ineligible for food stamps did not "directly and substantially interfere" with the right to associate as a labor union).

Based on the allegations in the Amended Complaint here, no plausible inference can be drawn that the conduct of any of the Defendants "directly and substantially" interfered with Ms. Wright or Ms. Bailey's ability to associate with their sons.  Rather, the Amended Complaint alleges an excessive use of force by police against two teenagers that caused the teenagers to suffer severe injuries.  While Plaintiffs attempt to make the requisite connection between Defendants' conduct and the familial relationship by arguing that the consequences of the injuries sustained by the teenagers deprived their mothers of intimate association, *see* ECF No. 12 at 22, such an argument concedes an intermediary element that was, as alleged, itself the direct cause of the deprivation—the injuries the teenagers suffered.  In this way the relationship between Defendants' alleged conduct and Plaintiff-Mothers' deprivation was not "direct."  Nor are there sufficient allegations to plausibly support that any deprivation was "substantial." [23]

---

[23]     The only case cited by Plaintiffs on this point, *Vanderhoff v. City of Nanticoke*, No. 3:18-CV-01071, 2018 WL 4565673 (M.D. Pa. Sept. 24, 2018), does nothing to support their claims. Indeed, in that case, the district court dismissed plaintiff's interference with intimate association claim.  With respect to the plaintiff's relationship with his father in that case—the portion of the claim relied upon by Plaintiffs, *see* ECF No. 12 at 21—the district court found the pleadings failed to set forth "how the challenged conduct interfered with, or placed an undue burden, on his intimate association with his [son].  In order to demonstrate a violation of his right to associate with his [son], [plaintiff] must allege that [defendant's conduct] prevented him from, or at least interfered with, continuing his relationship with [him]." *Vanderhoff*, 2018 WL 4565673, at *6

Indeed, adopting Plaintiffs' argument would unduly broaden the scope of constitutional liability for an interference claim by jettisoning the requirement that the relationship between the conduct of defendants and the interference itself be "direct and substantial."[24]  *Cf. Pi Lambda Phi Fraternity, Inc*, 229 F.3d at 438-39 ("Because almost any government sanction could be characterized as having *some* indirect effect on First Amendment activities, *see Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 706 (1986), indirect and attenuated effects on expression do not rise to the level of a constitutional violation.") (emphasis in original)). The relationship between Defendants' conduct and Plaintiff-Mothers' deprivation is, at best, indirect and attenuated. *Compare Burnsworth v. Westmoreland Cty.*, No. CV 19-650, 2020 WL 529885, at *3 (W.D. Pa. Feb. 3, 2020) (denying a motion to dismiss an interference with intimate association claim where the plaintiff alleged her termination occurred *solely* because of and in retaliation for her relationship with her mother).

Consequently, Plaintiff-Mothers' interference with intimate association claims necessarily fail and are dismissed.

###     5.     *Plaintiffs' state-created danger claims fail*

Counts four and thirteen of the Amended Complaint assert claims under the "state-created danger" doctrine against the School District Defendants.[25]  The state-created danger

---

(internal quotation marks omitted).  The same holds true here:  there are no allegations stating how, and to what extent, Plaintiff-Mothers' relationships with their sons have been impaired.

[24]     For example, under Plaintiffs' logic, Fourth Amendment claims of excessive use of force or false arrest/imprisonment would often, if not always, invite constitutional liability for interference with intimate association based upon indirect and attenuated effects on intimate relationships.

[25]     In the context of this claim, Plaintiffs' allegations with respect to conduct of the Whitehall-Coplay School District are inherently conclusory.  Such allegations are limited to the purported existence of policies and/or practices and/or customs of "a. Ordering armed police officers to physically remove a nonviolent student from the premises would result in bystanders being physically harmed; Relying on armed police officers to exclusively handle minor

doctrine acts as an exception to the general rule that the Due Process Clause of the Fourteenth

Amendment does not impose an affirmative obligation on the state to protect its citizens.

*Phillips v. Cty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).  In this way, a claim under the

state-created danger doctrine sounds in substantive due process, the touchstone of which is

"protection of the individual against arbitrary action of government."  *LaGuardia v. Ross Twp.*,

No. CV 3:15-1475, 2016 WL 4502443, at *8 (M.D. Pa. Aug. 29, 2016) (quoting *Wolff v.

McDonnell*, 418 U.S. 539, 558 (1974)), *aff'd*, 705 F. App'x 130 (3d Cir. 2017).  There are four

elements of a viable state-created danger claim:  that (1) the harm ultimately caused to the

plaintiff was foreseeable and fairly direct; (2) the state actor acted with a level of culpability that

"shocks the conscience;" (3) there was some relationship between the state and the plaintiff; and

(4) the state actor used his authority to create an opportunity for danger that otherwise would not

have existed.  *Phillips*, 515 F.3d at 235, 240; *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d

Cir. 2006).

        The Amended Complaint fails to adequately plead, at a minimum, the first and second

elements of a state-created danger claim.  To see why, it is helpful to briefly revisit the key

allegations.  Plaintiffs' own characterization of the key allegations states as follows:

> Plaintiffs have alleged that, at or around the time that Defendant Hartman gave the
> order to Defendant Stephens to remove Mr. Allen from the premises, Mr. Allen had
> joined the Plaintiffs and others in the bleachers. See Doc. 6, ¶¶31-32. At the
> direction and command of Defendant Hartman, Defendant Stephens demanded of
> the group, including Plaintiffs Burkett and Johnson, that Mr. Allen "come with
> him". Id. at ¶36. Plaintiffs Burkett and Johnson repeatedly asked Defendant
> Stephens why he was attempting to execute a seizure of Mr. Allen. Id. at ¶37.
> Defendant Stephens refused to provide a reason for the request other than to state

---

disturbances would result in bystanders being harmed; and c. Maintaining armed police officers
on premises would escalate otherwise minor incidents and result in physical harm to bystanders."
Am. Compl. ¶ 154.  In light of these conclusory allegations, there is no basis for state-created
danger liability against the District, and the Court limits its analysis to the potential for liability
against Hartman.

Defendant Hartman wanted Mr. Allen to leave. Id. at ¶38. Eventually, Defendants Cuth, Reed and Dugan, all of whom are also Caucasian, joined Defendant Stephens in the bleachers. Id. at ¶39. Plaintiffs Burkett and Johnson continued to ask Defendants Stephens, Cuth, Reed and Dugan for the reason for the attempted seizure of Mr. Allen. Id. at ¶40.

At this point, the following circumstances were present: Defendant Hartman commanded Defendant Stephens to remove Mr. Allen from the premises; at least three (3) additional armed officers joined Defendant Stephens; the armed police officers were confronting a large group of teens, most of whom were black, including Mr. Allen; the armed police officers were demanding that Mr. Allen leave the premises; Mr. Allen was refusing to leave the premises; Plaintiffs were asking the four (4) armed police officers for the basis of their request for Mr. Allen to vacate; and the armed police officers stated as their only justification for removing Mr. Allen was that Defendant Hartman wanted Mr. Allen to leave. At this point, Defendant Hartman possessed concrete information that the situation had escalated, and that further escalation would create a serious risk of harm. It would have been obvious to a reasonable person, based on common sense, that any further escalation would result in an increased risk of harm to all individuals in vicinity of Mr. Allen. Indeed, armed police officers were attempting to effectuate the removal of a student at Defendant Hartman's direction, and the student was insisting on the legal justification for same. Confronted with the aforementioned circumstances, Defendant Hartman made additional demands to Defendant Stephens that he remove Mr. Allen from the premises, which required physical intervention.

ECF No. 21 at 13-14.

### a.    Foreseeability

Assuming that Burkett and Johnson's harm was a "fairly direct" consequence of Hartman's directive for Officer Stephens to remove Allen from the gym, it is not the case that from this directive, even if the directive was unreasonable and given without justification, a reasonable person in Hartman's position[26] would foresee Burkett and Johnson being assaulted by police officers and suffering serious injury as a result.  Even assuming that, as alleged, once on the gym floor the teenagers followed every command to the letter, and the harm they suffered

---

[26]    The Third Circuit has adopted an objective standard for determining state of mind in the context of state-created danger claims.  *See Kedra v. Schroeter*, 876 F.3d 424, 439 (3d Cir. 2017).

was solely the result of the officers' use of excessive force and/or unreasonable conduct, Hartman could not have been expected to foresee that the officers would have acted in such a manner. That the situation had allegedly "escalated" prior to Hartman issuing his second command for removal of Allen—an argument Plaintiffs appear to hang their hat on—does not change the analysis. Simply put, the harm suffered by Burkett and Johnson as alleged is attributable to the acts of the Defendant police officers. Hartman had no involvement in those acts, and he could not have been expected to foresee that attempting to exercise his authority as athletic director over a group of students by way of a directive to an on-site police officer would lead to Burkett and Johnson suffering harm at the hands of that officer and others.[27]

#### b. Conscience-shocking culpability

Plaintiffs also fail to plausibly allege that Hartman's behavior exhibited a level of culpability that would "shock the conscience." The Third Circuit has advised that "three possible standards can be used to determine whether state action shocked the conscience: (1) deliberate indifference; (2) gross negligence or arbitrariness . . . ; or (3) intent to cause harm." *Phillips*, 515 F.3d at 241. "[T]he level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases." *Id.* at 240 (quoting *Sanford v. Stiles*, 456 F.3d 298, 306 (3d Cir. 2006)). "[A]lthough *intent* to cause harm must be found in a 'hyperpressurized environment,' where officials are afforded the luxury of a greater degree of deliberation and have time to make 'unhurried judgments,' *deliberate indifference* is sufficient to

---

[27]     Plaintiffs argue that the harm was foreseeable as a matter of "ordinary common sense." ECF No. 21 at 13. The Court finds "ordinary common sense" to dictate the opposite conclusion. Indeed, by Plaintiffs' logic, in many situations where school officials are faced with students who either question their directives or refuse to comply with them, those officials should foresee a risk of serious harm from continued attempts to enforce their directives, and assumedly should refrain from such continued attempts.

support an allegation of culpability." *Id.* (emphasis in original) (quoting *Sanford*, 456 F.3d at 306). In between these two extremes lies an intermediate standard: "[W]here the circumstances require a state actor to make something less exigent than a 'split-second' decision but more urgent than an 'unhurried judgment,' i.e., a state actor is required to act 'in a matter of hours or minutes,' a court must consider whether a defendant disregarded a 'great risk of serious harm rather than a substantial risk.'" *Id.* (quoting *Sanford*, 456 F.3d at 306); *see Johnson v. City of Philadelphia*, 975 F.3d 394, 401 (3d Cir. 2020). This intermediate standard—disregarding a great risk of serious harm—is "gross negligence or arbitrariness." *Sanford*, 456 F.3d at 306.

Here, assuming the circumstances did not require Hartman to make a split-second decision but required something more urgent than "unhurried judgment"—which, in the Court's view, is a liberal reading of Plaintiffs' allegations—it cannot be said that Hartman disregarded a great risk of serious harm. This is necessarily so because as already determined, the harm suffered by Burkett and Johnson was not foreseeable, and one cannot disregard a risk that was never foreseeable to begin with. *Cf. Keener v. Hribal*, 351 F. Supp. 3d 956, 972-73 (W.D. Pa. 2018) (explaining the "deliberate indifference" standard "requires a willingness to ignore a foreseeable danger or risk . . . . It necessarily follows that as threshold matter, the danger must be foreseeable to demonstrate deliberate indifference."[28] (quoting *D.M. by Sottosanti-Mack v. Easton Area Sch. Dist.*, No. CV 17-1553, 2017 WL 6557560, at *5 (E.D. Pa. Dec. 22, 2017))). No reasonable person in Hartman's position would have foreseen a great risk of serious harm resulting from a directive to an on-site police officer to have a student removed from a gym during a high school basketball game.[29] As a consequence, Hartman's conduct cannot be said to

---

[28] This logic applies equally under the gross negligence standard.

[29] Even if the Court were to find that Plaintiffs' allegations indicate that Hartman's conduct under the circumstances was negligent, "[t]he Due Process Clause is simply not implicated by a

"shock the conscience." *Compare Pagan v. Rivera*, No. CV 19-7176, 2020 WL 2060274, at *6

(D.N.J. Apr. 29, 2020) (finding a police officer "disregarded a great risk of serious harm" when

he required a woman, who had sought help from threats made by an abusive ex-boyfriend, to go

into her home to retrieve a copy of the protective order against him and then required her to re-

enter her home to retrieve her identification, causing her to be assaulted).

For these reasons, Plaintiffs' state-created danger claims fail and are dismissed.

### 6.    *Plaintiffs' claims for civil rights conspiracy fail*

Counts five and fourteen of the Amended Complaint assert claims for conspiracy to

violate civil rights pursuant to 42 U.S.C. § 1983.  Counts seven and sixteen of the Amended

Complaint assert claims for conspiracy under 42 U.S.C. § 1985.

There are three elements of a claim of conspiracy to violate civil rights brought pursuant

to § 1983:  that (1) two or more persons conspire to deprive any person of constitutional rights;

(2) one or more of the conspirators performs an overt act in furtherance of the conspiracy; and

(3) that overt act causes an injury to the plaintiff's person or property or deprives the plaintiff of

a right or privilege of a citizen of the United States, "with the added gloss . . . that 'the

conspirators act 'under the color of state law.'"  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280,

294 n.15 (3d Cir. 2018) (quoting *Barnes Foundation v. Township of Lower Merion*, 242 F.3d

151, 162 (3d Cir. 2001)).  Section 1985(3) also permits a conspiracy claim, where such a claim is

premised upon the existence of a conspiracy "for the purposes of depriving . . . any person or

class of persons of the equal protection of the laws, or of equal privileges and immunities under

the laws."  *See Wongus v. Corr. Emergency Response Team*, 389 F. Supp. 3d 294, 302 (E.D. Pa.

---

*negligent* act of an official causing unintended loss of or injury to life, liberty, or property."
*Johnson*, 975 F.3d at 402 (emphasis in original).

2019).  The elements of a § 1985(3) claim are:  "(1) a conspiracy of two or more persons; (2)

motivated by racial or class based discriminatory animus designed to deprive . . . any person or

class of person to the equal protection of the laws; (3) an act in furtherance of the conspiracy;

and (4) an injury to person or property or to the deprivation of any right or privilege of a citizen

of the United States."  *Campbell v. Navient Corp.*, No. CV 18-1625, 2020 WL 5439799, at *4

(D. Del. Sept. 10, 2020) (citing *Brown v. Philip Morris Inc.*, 250 F.3d 789, 805 (3d Cir. 2001)).

The central element of a conspiracy claim under § 1983 as well as § 1985 is of course the

existence of a conspiracy between two or more persons.[30]  To plausibly allege a conspiracy, a

plaintiff "must provide some factual basis to support the existence of the elements of a

conspiracy: agreement and concerted action."  *Jutrowski*, 904 F.3d at 295 (quoting *Capogrosso

v. Supreme Court of N.J.*, 588 F.3d 180, 184-85 (3d Cir. 2009)).  To adequately plead an

agreement, a plaintiff must allege that "the state actors named as defendants in the[ ] complaint

somehow reached an understanding to deny [the plaintiff] his rights."  *Id*. (quoting *Kost v.

Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993)); *Spencer v. Steinman*, 968 F. Supp. 1011, 1020

(E.D. Pa. 1997) ("[T]o state a claim for conspiracy under § 1983, plaintiff must make 'factual

allegations of combination, agreement, or understanding among all or between any of the

defendants [or coconspirators] to plot, plan, or conspire to carry out the alleged chain of events.'"

(quoting *Hammond v. Creative Financial Planning Organization*, 800 F. Supp. 1244, 1249

(E.D.Pa. 1992)).  In the absence of direct evidence, allegations of circumstantial evidence in

support of an agreement may suffice.  *See Jutrowski*, 904 F.3d at 295.

---

[30]     Of course, both types of claims also require an underlying constitutional violation.  *See
Jutrowski*, 904 F.3d at 295.  The Court assumes this element has been sufficiently alleged, as
Defendants do not move to dismiss Plaintiffs' Fourth Amendment or First Amendment
retaliation claims.

The Amended Complaint's allegations fail to sufficiently allege an agreement between two or more people to deprive Burkett and Johnson of their constitutional rights. What the Amended Complaint does attempt to state on this point is inherently conclusory. Having scoured the 374 paragraphs and 93 pages of the Amended Complaint, the following is the extent of the allegations the Court is able to identify as to the existence of an agreement between the Defendants:

> Defendant Officers engaged in a scheme, plan and design to assist in covering up their and their fellow Defendant Officers outrageous conduct by, inter alia, filing false police reports, lying about the incident, and maliciously prosecuting Plaintiffs on false and fabricated charges. A true and correct copy of the Affidavit of Probable Cause is attached hereto, made a part hereof and marked as Exhibit "C."[31]

> Notably, the Affidavit fails to mention Plaintiff Johnson's head being slammed into the wall/locker, Plaintiff Burkett being suplexed, head first, into the ground by Defendant Officers, or the K-9 being lifted from the ground and swung around at the minor children.

Am. Compl. ¶¶ 82-83.

> Direct evidence of conspiracy is rarely available and therefore, the existence of a conspiracy must usually be inferred from the circumstances.

> a. The Defendants were present when each of them committed his unconstitutional assault upon the Plaintiff and not one of them cautioned, restrained or prevented each other from engaging in this wrongdoing, even though the opportunity clearly existed to do so, and even though the obligation to do so also existed;

> b. The Defendants acted fully in concert – one with the other, obviously demonstrating the common plan, scheme or design that they agreed upon, when the assaults occurred;

> c. The Defendants agreed thereafter to fabricate, and did fabricate, a continued story wherein they either falsely depicted Plaintiff's conduct and each other's acts or they failed to mention the assaults or their aftermath.

---

[31]   The Amended Complaint as filed on the Court's electronic docket does not have an "Exhibit C." *See* ECF No. 6. The Court is unable to find the affidavit Plaintiffs reference anywhere else on the docket.

d.  The sole purpose of this fabrication was an attempt to excuse or otherwise justify and cover-up the unconstitutional assault upon Plaintiff and his Constitutionally guaranteed civil rights; and

e.  The Defendants' false reporting (or no reporting) was done in concert to avoid the detection of their unlawful and unconstitutional acts.

*Id.* ¶¶ 167(a)-(e), 283(a)-(e).

This all constitutes clear evidence of a civil conspiracy engaged in by Defendant Officers and those co-conspirators who are presently unidentified, who agreed to, and did, conceal independent evidence of Defendants' wrongdoing in this case.

*Id.* ¶¶ 169, 285

It is also clear from the foregoing that the Defendants, and each of them together:

a.   Engaged in a single plan, the essential nature and scope of which was known by them;

b.  Executed that plan in a coordinated way and by a common design which had as its probable and natural consequence the violation of Plaintiff's Constitutional rights as set forth herein;

c.   Acted in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which was an agreement between them to inflict a wrong against, or injury upon, Plaintiff as more fully set forth herein; and

d.  As a direct and proximate result of the foregoing, and the overt acts described herein, Plaintiff suffered the damages enumerate.

*Id.* ¶¶ 171(a)-(d), 287(a)-(d).

This conspiracy, as it applied to the Plaintiff herein, was an express or implied agreement between the Defendants, to deprive the Plaintiff of his Constitutional rights, inter alia, to be free from excessive use of force.

*Id.* ¶¶ 173, 289.

The Defendants were voluntary participants in the common venture, understood the general objectives of the plan, and knew it involved the likelihood of the deprivation of Constitutional rights, accepted those general objectives, and then agreed, either explicitly or implicitly, to do their part to further those objectives.

*Id.* ¶¶ 174, 290.

These allegations are overwhelmingly conclusory.[32]  The only non-conclusory allegation

that could conceivably support the existence of an agreement between the Defendants is

Plaintiffs' allegation that the affidavit of probable cause omitted certain details of the relevant

evening's events.  *See* Am. Compl. ¶¶ 82-83.  However, this fact, on its own, is insufficient to

plausibly support the existence of an agreement between Defendants to violate Burkett's and

Johnson's constitutional rights.[33]  *See* Campbell, 2020 WL 5439799, at *4 ("[T]he Amended

Complaint does not describe how Defendants allegedly conspired with each other or other

unnamed parties to deprive Plaintiff or that a conspiracy took place that was motivated by any

racial or class-based discrimination toward Plaintiff."); *Floyd v. Olshefski*, No. 3:13-CV-578,

2015 WL 1405278, at *6 (M.D. Pa. Mar. 26, 2015) ("In a conclusory fashion, the amended

complaint states that '[a]ll Defendants, jointly and severally, acted to conspire to deprive

Plaintiff of his right to equal protection under the law, to exercise his First Amendment rights,

and to be free from physical abuse rising to cruel and unusual punishment.' . . . The law is clear

that bare allegations of wrongdoing by a Defendant, without any substantiating proof of an

---

[32]    Plaintiffs primary argument in support of a conspiracy appears to be that "all of the
Defendants' conduct was identical or similar, and was committed in or around the same time and
at the same place."  ECF No. 12 at 19.  However, apart from the undisputed fact that the events
at the heart of Plaintiffs' claims occurred on a single date and at a single location, is not clear on
the face of the allegations that "all of the Defendants' conduct was identical or similar."  Even if
it were, it is not evident to the Court how this necessarily supports the existence of a conspiracy.
[33]    Plaintiffs also state that the affidavit supports the existence of a conspiracy as its content
is, in the affidavit's own words, based on "fellow police testimonies."  ECF No. 12 at 20.
However, Plaintiffs provide no support for the contention that an affidavit of probable cause—or
any other testimonial law enforcement document such as a police report—that relies in part on
information obtained from fellow police officers becomes suspect based on that fact alone.  *See*
*Summerville v. Gregory*, No. 14-CV-7653, 2019 WL 4072494, at *21 (D.N.J. Aug. 29, 2019)
("There is generally a presumption that police officers may reasonably rely upon the
investigations of other law enforcement officials when requested to aid or assist in a seizure or
arrest." (citing *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971)),
*reconsideration denied*, No. 14-CV-7653, 2019 WL 5617716 (D.N.J. Oct. 31, 2019).

unlawful agreement, are insufficient to sustain a conspiracy claim."); *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010); *see also Young v. Kann*, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991) ("Since Young's conspiracy claims do not appear to be based in fact, but merely upon his own suspicion and speculation, we hold that the district court did not err in dismissing them . . . .").

Because the Amended Complaint fails to plausibly allege the existence of an agreement between two or more Defendants to violate Burkett's and Johnson's rights, Plaintiffs' conspiracy claims necessarily fail and are dismissed.

### 7.   *Plaintiffs' claims for municipal liability fail*

Counts three and twelve of the Amended Complaint assert claims for municipal liability against Whitehall Township.  The claims for municipal liability are premised on underlying constitutional violations of Plaintiffs' First and Fourth Amendment rights.[34]

In *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), the Supreme Court overruled its holding in *Monroe v. Pape* that "Congress did not undertake to bring municipal corporations within the ambit of [42 U.S.C. § 1983]."[35]  365 U.S. 167, 187 (1961). Since *Monell*, it has been well settled that local governments can be liable as "persons" under Section 1983; however, this liability extends only to "their *own* illegal acts."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original) (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 479 (1986)); *see Monell,* 436 U.S., at 665-83.  This limitation is a corollary of the

---

[34]    As noted previously, for purposes of this Opinion the Court assumes Plaintiffs have pleaded viable underlying constitutional claims for violation of their First and Fourth Amendment rights by way of § 1983.

[35]    In reversing course from its decision in *Pape*, the Court in *Monell* stated as follows: "Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies."  436 U.S. at 690 (emphasis in original).

established principle that municipalities "are not vicariously liable under § 1983 for their

employees' actions."  *Connick*, 563 U.S. at 60; *Monell*, 436 U.S. at 691 ("[A] municipality

cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality

cannot be held liable under § 1983 on a *respondeat superior* theory.") (emphasis in original).

To avoid § 1983 municipal liability collapsing into vicarious liability, a § 1983 plaintiff

seeking to recover against a municipality must, in the context of a Rule 12(b)(6) motion to

dismiss, plead that the complained-of injury was caused directly by a local government's "policy

or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy."[36]  *Harris v. City of Philadelphia*, 171 F. Supp. 3d 395, 400 (E.D. Pa.

2016) (quoting *Monell*, 436 U.S. at 694).  That is to say, a municipal policy or custom—as

opposed to the independent conduct of a municipal employee—must be the "driving force"

behind the alleged harm.  *Weston v. City of Philadelphia*, 82 F. Supp. 3d 637, 649 (E.D. Pa.

2015).  In this context, a municipal "[p]olicy is made when a decision maker possessing final

authority to establish municipal policy with respect to the action issues an official proclamation,

policy, or edict."  *Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d 656, 667 (E.D. Pa. 2017)

(quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996)).  A municipal custom, on the

other hand, "is established 'by showing that a given course of conduct although not specifically

endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.'"

*Kelty v. City of Philadelphia*, No. CV 16-0306, 2016 WL 8716437, at *3 (E.D. Pa. June 10,

2016) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).

---

[36]      A viable § 1983 claim also requires the existence of "a direct causal link between a
municipal policy or custom and the alleged constitutional deprivation."  *Harris*, 171 F. Supp. 3d
at 400 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

"Where the [municipal] policy 'concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to "deliberate indifference" to the rights of persons with whom those employees will come into contact.'" *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)). "'[D]eliberate indifference' is a stringent standard of fault," *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404-05 (1997), and "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Brown*, 520 U.S. at 409). Such a pattern of behavior is necessary to put municipal policymakers on notice that a new program is required; through continued adherence to a policy they know or should know violates the rights of others, they demonstrate deliberate indifference.[37] *Thomas*, 749 F.3d at 223. As the Supreme Court has observed, a lesser standard of fault for failure-to-train claims brought pursuant to Section 1983 "would result in *de facto respondeat superior* liability on municipalities"—a result the Court explicitly rejected in *Monell*. *City of Canton*, 489 U.S. at 392.

---

[37]   In a narrow range of circumstances, municipal liability under a failure to train theory may be shown without a pattern of prior conduct, but only where:

> (1) "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools [or skills] to handle recurrent situations," and (2) the likelihood of recurrence and predictability of the violation of a citizen's rights "could justify a finding that [the] policymakers' decision not to train an officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right."

*White v. Brommer*, 747 F. Supp. 2d 447, 463 (E.D. Pa. 2010) (quoting *Kline ex rel Arndt v. Mansfield*, 255 Fed. Appx. 624, 629 (3d Cir. 2007)); *see Brown*, 520 U.S. at 398.

Plaintiffs appear to bring their municipal liability claims under both an affirmative policy or custom theory as well as a failure to train theory. The Court will address the viability of each theory individually in light of the allegations.

### a.      Affirmative municipal policy or custom

As to the claim of the existence of an affirmative municipal policy or custom, Plaintiffs state the following:

> [T]he Complaint specifically alleges that the following policies and/or customs, inter alia, were directly responsible for the harm suffered by the Plaintiffs:
>
> > Training Whitehall Township Police Officers to lift already restrained minor children off the ground and into the air and suplex those children's heads into the floor as an acceptable form of restraint;
> >
> > Training Whitehall Township Police Officers that slamming minor children's heads into the ground is an objectively reasonable use of force under the circumstances described herein;
> >
> > Training Whitehall Township Police Officers that lifting already restrained minor children off the ground and into the air and suplexing those children heads into the floor is an objectively reasonable use of force under the circumstances described herein;
> >
> > Establishing official policies and/or decisions and/or acquiescing to customs, usages and/or practices in utilizing K-9 officers for minor disturbances resulting in the escalation, rather than the de-escalation of potentially volatile police encounters.

ECF No. 12 at 11 (citing Am. Compl. ¶ 88).

These allegations are conclusory and do not support a plausible inference as to the existence of a policy or custom of Whitehall Township. Rather than pleading through particular factual allegations the existence of a policy or custom pursuant to which the individual police officers were conducting themselves, Plaintiffs are working in reverse, attempting to impute the existence of a municipal policy or custom as reflected by the discrete conduct of the police

officers.[38]  This is, in essence, an attempt to hold the municipality vicariously liable for the

conduct of its agents—a clearly prohibited outcome under § 1983.

### b.   Failure to train

Plaintiffs also attempt to state a municipal liability claim premised not on an affirmative

municipal policy, but rather on a failure to train theory.  On this point, Plaintiffs contend as

follows:

> Plaintiffs have alleged that Defendant Township and Marks' failures to train were,
> inter alia, as follows:
>
> > Failing to train Whitehall Township Police Officers to not violently slam
> > minor children's heads into the ground;
> >
> > Failing to train Whitehall Township Police Officers to not lift already
> > restrained minor children off the ground and into the air and suplex those
> > children's heads into the floor;
> >
> > Failing to train Whitehall Township Police Officers that slamming minor
> > children's heads into the ground is not an objectively reasonable use of force
> > under the circumstances described herein;
> >
> > Failing to train Whitehall Township Police Officers that lifting already
> > restrained minor children off the ground and into the air and suplexing those
> > children heads into the floor is not an objectively reasonable use of force
> > under the circumstances described herein;

---

[38]     Indeed, Plaintiffs appear to simply assume the existence of a municipal policy or custom
that is consistent with the alleged conduct of the police officers:

> While Defendants may ultimately be successful in proving that there is nothing
> constitutionally amiss with Defendants Township and Marks specifically training
> their officers to lift already restrained minor children off the ground and into the air
> and suplex those children's heads into the floor, it cannot be reasonably disputed
> that affirmatively training officers to do so constitutes an official policy or decision.

ECF No. 12 at 11-12.  However, Plaintiffs have failed to allege through specific facts that
"Defendants Township and Marks specifically train[ ] their officers" to conduct themselves in
any manner, let alone in a manner consistent with the allegedly unlawful conduct directed at
Burkett and Johnson.

> Establishing official policies and/or decisions and/or acquiescing to customs, usages and/or practices that seek to escalate, rather than deescalate potentially volatile police encounters[.]

ECF No. 12 at 13-14 (citing Am. Compl. ¶ 88).

These are conclusory allegations that clearly suffer from the same defect as the allegations Plaintiffs point to in support of an affirmative policy or custom. They attempt to show that the discrete conduct of the Defendant police officers is, in and of itself, indicative of an absence of training. In the end the flaw in the argument is the same: Plaintiffs cannot, based upon the alleged conduct of the individual Defendants alone, impute to the municipality either (a) the existence of an affirmative policy or custom to act consistent with that conduct, or (b) the absence of training to *not* act consistent with that conduct. Both would result in holding the municipality vicariously liable for the alleged tortious conduct of its agents.[39]

Because the allegations in the Amended Complaint fail to plausibly suggest that the harm suffered by Burkett and Johnson was caused by the existence of an affirmative policy or custom as to Whitehall Township police officers, or by a failure to train those police officers, Plaintiffs' municipal liability claims necessarily fail and are dismissed.

---

[39] In their opposition to the Township Defendants' motion, Plaintiffs contend that "Whitehall Police engaging with children is a recurring situation, that much is clear, and, just like adults, children at times are accused of committing crimes and/or being involved in disturbances." ECF No. 12 at 14. To the extent that Plaintiffs are attempting here to show a pattern of behavior, this contention, in addition to not being pleaded, is utterly vague and unhelpful. *See Tucker v. Sch. Dist. of Philadelphia*, No. CV 19-889, 2019 WL 3802066, at *4 (E.D. Pa. Aug. 13, 2019) ("[Plaintiff] alleges, with no supporting factual assertions, that the School District knew of 'historically similar unlawful conduct against special needs students,' but such 'vague assertions of policy or custom' are insufficient to survive a motion to dismiss.").

### C.       Leave to Amend

The Court must consider whether to grant Plaintiffs leave to amend so as to re-plead some or all of the claims that have been found to fail. *See Kanter v. Barella*, 489 F.3d 170, 181 (3d Cir. 2007) ("Generally, a plaintiff will be given the opportunity to amend her complaint when there is an asserted defense of failure to state a claim."). Although leave to amend pleadings, when not as of right, should be "freely give[n] when justice so requires," FED. R. CIV. P. 15(a)(2), the denial of leave to amend is appropriate where there exists undue delay, bad faith, dilatory motive, or futility. *See Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000); *Holst v. Oxman*, 290 F. App'x 508, 510 (3d Cir. 2008).

Any and all claims against Chief Michael Marks, Mayor Michael Harakal, and Superintended Lorie Hackett in their official capacities are duplicative of other claims.  These claims cannot be cured with additional factual allegations.  They are therefore futile and will be dismissed with prejudice and without leave to re-plead.

Plaintiffs' claims under the Pennsylvania Constitution are also futile, as settled law establishes that no private right of action exists to seek damages directly under the Pennsylvania Constitution.  These claims will therefore be dismissed with prejudice and without leave to re-plead.

The Court also finds Plaintiffs' claims brought pursuant to 42 U.S.C. § 1981 to be futile. As explained previously, Plaintiffs' lawsuit is factually not of the type that can proceed under § 1981.  Specifically, there are no allegations—nor is it apparent how there could be—that can plausibly support that Plaintiffs suffered race-based discrimination concerning one or more of the activities enumerated in § 1981:  the making and enforcing of contracts, suing, being a party to a

lawsuit, and giving evidence.  As a result, these claims will be dismissed with prejudice and without leave to re-plead.

The same thing can be said of Plaintiff-Mothers' claims for interference with the right of intimate association.  These claims simply do not fit in this lawsuit, which is an excessive force and retaliation suit.  There is nothing additional that Plaintiff-Mothers can allege from which to plausibly infer that any of the Defendants "directly and substantially" interfered with Ms. Wright or Ms. Bailey's ability to associate with their sons.  What is more, as raised in the Amended Complaint, these claims are in their second iteration.  Plaintiffs raised them in the initial Complaint, *see* ECF No. 1, and Defendants moved to dismiss them in their initial motion to dismiss, which presented the same arguments on which Defendants seek dismissal of the instant claims, *see* ECF No. 5.  Plaintiffs were therefore on notice of the potential defects in these claims and failed to cure them in the Amended Complaint—assumedly because they cannot be cured. For all of these reasons, these claims will be dismissed with prejudice and without leave to re-plead.

The Court finds that Plaintiffs' claims for municipal liability against either Whitehall Township or Whitehall-Coplay School District are also futile.  As with their interference with intimate association claims, these claims were asserted in the initial Complaint and Plaintiffs were put on notice as to their potential defects when Defendants first sought their dismissal.  *See* ECF Nos. 1, 5.  They remain deficient in their current form:  there is no indication of the existence of an affirmative municipal policy, or of a failure to train, that shares any causal connection to the harm allegedly suffered by Plaintiffs.  Rather, Plaintiffs' alleged harm is clearly the result of the conduct of individual police officers, and any attempt to impute vicarious liability to either Whitehall Township or Whitehall-Coplay School District is foreclosed by

settled law.  These claims will therefore be dismissed with prejudice and without leave to re-plead.

Plaintiffs' claims premised on the state-created danger doctrine are similarly futile.  It is simply improbable that there exist facts that could have been but were not pleaded in either the 55-page initial Complaint or the 93-page Amended Complaint, that would plausibly support liability under the doctrine—*i.e*., that Hartman's directives to have Mr. Allen removed from the gym would foreseeability lead to a great risk of Burkett and Johnson suffering serious harm at the hands of police, and that in directing Mr. Allen's removal, Hartman acted with a level of culpability that "shocks the conscience."  Consequently, Plaintiffs' state-created danger claims will be dismissed with prejudice and without leave to re-plead.

Finally, the Court turns to Plaintiffs' claims for conspiracy under § 1983 and § 1985.  Although in their current form these claims are deficient, the Court cannot say with certainty that there are no as-of-yet unpleaded facts capable of plausibly supporting the existence of an agreement between the Defendants.  Therefore, in an abundance of caution, the Court will dismiss these claims without prejudice, and with leave to re-plead.  However, Plaintiffs are advised that they should only consider filing a second amended complaint and re-pleading their conspiracy claims if there are actually facts they have somehow overlooked that are capable of plausibly suggesting the existence of an agreement.

## V.    CONCLUSION

For the reasons set forth above, Defendants' three motions to dismiss are granted.  The Amended Complaint is dismissed as to all counts except counts one and ten, counts two and eleven, and counts nine and eighteen, these being the claims of which Defendants declined to seek dismissal.  Plaintiffs will be permitted to file a second amended complaint and re-plead their

claims for conspiracy under § 1983 and § 1985, subject to the guidance and directives set forth in this Opinion.

A separate Order follows this Opinion.

BY THE COURT:


_/s/ Joseph F. Leeson, Jr._____
JOSEPH F. LEESON, JR.
United States District Judge